FOURNET, Justice.
 

 The plaintiffs, twenty-five resident property owners and taxpayers of the City of New Orleans, are appealing from a judgment dismissing their suit against the Mayor and the Commission Council of the City of New Orleans and instituted by them for the purpose of having declared null the election held on April 15, 1947, in pursuance to Ordinance No. 17549, adopted on February 28, 1947, authorizing the issuance of bonds aggregating $23,500,000 and being (Purpose A) $12,000,000 for the payment of the city’s portion of the cost of eliminating grade-crossings in the city by the construction of over and underpasses; (Purpo'se B) ’ $10,500,000 for surfacing, resurfacing, blacktopping, repairing, and improving the streets of the city; and (Purpose C) $1,000,000 for the acquisition of the necessary lands and improvements for the civic center proposed for the city; and for the further purpose of enjoining the issuance of the bonds or the execution of any contract relative to or for the construction of these proposed improvements.
 

 Because of the public importance of the matter the defendants, after filing an answer within the delays allowed by law, obtained an order fixing the trial of the case for July 9, 1947. On that day the plaintiffs objected to going to trial, filing a motion for a continuance wherein they averred that, being an ordinary suit, the case could not be fixed without their con
 
 *521
 
 sent; they also asked that the trial be deferred for a period of three months in order that they might have sufficient time to fully prepare the proof to support the allegations of their petition.
 

 In overruling this motion, the trial judge declared the nature and importance of the case required an early trial and disposition thereof, but he did order the case continued until July 16 to afford the petitioners sufficient time within which to apply for writs to the Supreme Court to determine whether he had abused his discretion in refusing the same. This court refused the writ when it was applied for, assigning as its reason the lack of a showing on the part of the applicants that the judge had abused his discretion.
 

 On the day the trial of the case was resumed, the petitioners filed another written motion for a continuance until the regular term of court in October, suggesting that because the regular term of court had ended the day previous, July 15, at midnight, the court was without authority to try the case during the vacation that began at midnight. This motion was also overruled and the case, after trial on the merits, was dismissed.
 

 In this court the plaintiffs are contending that because of the provisions of Section 43 of Article VII of the constitution of 1921 and Section 1 of Rule 4 of the Rules of the Civil District Court, the latter declaring the court shall remain in continuous session during the period beginning October 1 of each calendar year and ending on July 15 following, when the court shall adjourn for an annual vacation that commences on July 16 and ends on September 16 following, the judgment appealed from is null and void and the case must, therefore, be remanded for retrial. They cite as authority the case of Teacle v. Hughes, 146 La. 195, 83 So. 457, and the authorities therein cited.
 

 Courts are those instrumentalities of government to which the public administration of justice is delegated. They are created by the people of the sovereignty and function solely to insure that the fundamental rights of life, liberty, and the peaceful possession of property guaranteed to each and every person under our form of government are protected and our civilized society preserved, so that we may live in the peace and happiness intended by our founding fathers. To that end our constitution declares that
 
 “All courts shall be open, and every person for injury done him
 
 in his rights, lands, goods, person or reputation
 
 shall have adequate remedy by due process of law and justice administered without
 
 denial, partiality, or
 
 unreasonable delay."
 
 Section 6 of Article I of the Constitution of 1921. (Italics ours.)
 

 While under Section 43 of Article VII of the constitution it is made the mandatory duty of the Civil District Court of the Parish of Orleans to hold continuous sessions during nine and a half months of the year, there is no prohibition in this pro
 
 *522
 
 vision against the holding of court during the so-called vacation period. The provision is that the court “shall hold continuous sessions during nine and a half months of the year,” and when the public business demands it, the court not only has the right to try cases of importance to the public during the vacation period, but it is the court’s duty to do so. State v. Thompson, 121 La. 1051, 46 So. 1013; Lawrason v. Swartz, 132 La. 511, 61 So. 554; State v. Bradford, 164 La. 423, 114 So. 83. And in adopting its rules, the court never intended to deviate from this policy of public service and expediency but intended, instead, that the rules should be. used for the court’s own guidance in regulating the orderly procedure to be followed before it in the transaction of the public’s business.
 

 The election, and the proposed bond issue it was to authorize, was called for only one purpose — to secure the necessary funds for the construction, expansion, and improvement of facilities vital to the city. Under our law a contest of such an election must be filed within 60 days after the election is held and its contest should be tried as expeditiously as possible, without any unreasonable or unnecessary delays. Notwithstanding this, the plaintiffs, arguing both orally and in brief, stated they purposely filed this suit via ordinaria to avoid its summary or expeditious trial. The relief sought by them, however, is injunctive, and the fact that they did not proceed by rule is immaterial. The matter is controlled by the injunctive statute and this act specifically provides that any hearing under the act “may be had .in chambers or at term time.” Section 5 of Act No. 29 of 1924. It is such a procedure, therefore, that must, under Rule 4 of the Rules of the Civil District Court (relied on by the appellants), be tried during vacation under our existing laws.
 

 Counsel strenuously argue, however, that they were unable to ascertain what certificates showing the assessment valuation of the voter’s property were allegedly fraudulently withheld, making it impossible for them to adequately prepare for the trial of the case on the date set, because they were not allowed to look at the records at the City Hall until June 25, two days after the answer of the city was filed.
 

 It seems to us, as it did to our learned brother below, that the plaintiffs when they filed their suit — two days before the prescriptive period had elapsed and 58 days after the election they are attacking was held — should have had at least some evidence to support their numerous allegations, among which is the allegation that some 35,000 people were deprived of their right to vote because the required certificates were not mailed to them by those interested in the favorable outcome of the election. Furthermore, although the case was not actually tried until July 16, some three months after the election and more' than a month
 
 *523
 
 after the suit was filed (the actual trial consumed some three days), the record shows the plaintiffs offered no evidence that would indicate fraud was practiced by the proponents of the bond issue in the issuance of these assessment certificates, as they alleged. Obviously, the only purpose the' requested continuance could have served, other than to unnecessarily prolong the litigation and thereby unduly delay the sale of the bonds and the ultimate completion of the improvements for which the funds derived therefrom were intended, would have been to give the plaintiffs an opportunity to enter into an expedition for the discovery of evidence that would support the allegations of their petition and that they did not have when they filed their suit, a procedure that is not only not favored by the courts of this state, but one that would be in violation of the public policy with respect to the expeditious contest of bond issue elections.
 

 The authorities cited by the appellants in support of their contention that they should have been granted a continuance are neither apposite nor controlling here and, therefore, no useful purpose could be served in analyzing them.
 

 It is our opinion, therefore, that the trial judge correctly overruled the motion for a continuance.
 

 The petition itself is somewhat lengthy and contains numerous statements and conclusions, many of them without facts upon which they áre based being given and others based on facts not borne out by the records. As it is drawn it is confusing, but we think that all of its 29 allegations are either an attack on (1) the legality of the ordinance, (2) the legality of the election, or (3) form a part of an alleged fraudulent scheme purportedly entered into by the proponents of the bond issue to secure its favorable passage. A simplified analysis of these allegations, which the court must dispose of, is as follows:
 

 (A) The ordinance calling the election is illegal, null, and void in that (1) such an election is prohibited under the Constitution of 1921; (2) the ordinance was not approved by three-fourths of the members of the Board of Liquidation, City Debt, as required by the constitution; (3) the $12, 000,000 proposed under Purpose A is insufficient to cover the city’s share of constructing the over and underpasses needed to eliminate grade-crossings; and (4) the ordinance is so indefinite it not only fails to insure that the city and not the Public Belt Railroad will have the control and expenditure of the funds derived from the sale of the bonds but also to insure that these funds will actually be spent for the purposes intended and not for other purposes, such as the construction of a railroad passenger or terminal station.
 

 (B) The election was illegal, null, and void in that (1) the use of voting machines in the conduct of such an election is not authorized by the Voting Machine Law and, in the alternative, if so autho
 
 *524
 
 rized, then the law is unconstitutional; in any event, in addition to the failure to follow the provisions of the act in conducting the election, many other illegal practices were perpetrated which vitiate the same, viz.: (a) the list of commissioners selected to serve at the election was not submitted to the Commission Council and these commissioners were not appointed by the council within the 35-day period provided by law; (b) the voters were deprived of the secrecy of the ballot by the manner in which the voting machines were used; (c) the machines were so fixed in some precincts that they would not register a vote against the bond issue, (d) some of the commissioners serving in the special election were absent from the polls until they put in an appearance at closing time to certify and sign the poll sheets, and (e) the commissioners serving in the general election, being of the opinion that the commissioners selected to supervise the special election were unauthorized, refused to allow such commissioners to serve in many instances until compelled to do so by intimidation and force on the part of the city police.
 

 (C) That the favorable vote secured was the result of a' general scheme on the part of the Commission Council to confuse and mislead the voters, the council, as a part of such scheme, (1) fraudulently withholding some 35,000 of the 160,000 assessment certificates prepared for mailing to the prospective voters, and, by means of an opinion rendered by the city attorney, led the voters to believe only those holding assessment certificates would be allowed to vote, contrary to the provisions of the ordinance permitting those not possessing certificates to vote by making out an affidavit as to their assessment, with the result that many voters were deprived of their right to vote; and (2) ordering the election held at the same time a general election to select a Justice of the Supreme Court was being conducted, the same polling places being used but with different sets of commissioners to supervise the two elections.
 

 The election in contest here was held under the authority of Act No. 4 of 1916, as amended, which act was adopted as an amendment to the Constitution of 1913 and was specifically maintained and preserved in the Constitution of 1921, the only difference being that the Constitution of 1921 amended Section 8 of the act. See Section 24 of Article XIV of the Constitution of 1921. Under Section 4 of this act the City of New Orleans is empowered— when authorized by a vote of a majority in number and amount of the property taxpayers qualified to vote at an election held after due notice has been published for 30 days in the official journal, pursuant to a call for that purpose in an ordinance adopted by two-thirds of the members of the Commission Council and approved by three-fourths of the members of the Board of Liquidation, City Debt — to issue and negotiate its
 
 *525
 
 bonds. The only limitation placed on the city’s authority and power in this respect is to be found in Section 13 of the act, which declares that the total issue of bonds by the City of New Orleans for all purposes shall never exceed 10% of the assessed valuation of the property in the city. But in computing the indebtedness of the city for this purpose, bonds issued under the special acts enumerated in Section 13 (Nos. 6 of 1899, 19 of 1906, and 179 of 1908) or those that might thereafter be issued for water, sewerage, and drainage purposes, for new public improvements, for the Public Belt Railroad, or for the acquisition or construction of any revenue producing public utility, as well as those paving certificates that are primarily chargeable against special assessments for street paving are not included.
 

 The record shows that in adopting the ordinance calling this election the city fully complied with all of these requirements, including the approval of the ordinance by three-fourths of the members of the Board of Liquidation, City Debt, before the election was ordered, the allegations of the petition to the contrary notwithstanding, and it also shows that the 10% limitation placed on the city’s power to issue these bonds was not exceeded. Clearly, therefore, the contention of the plaintiffs that this election was unauthorized is without merit.
 

 We think, as did the trial judge, that the further argument of counsel for plaintiffs that the bonds are illegal because the provisions of Section 8 of the act of 1916, as amended by the Constitution of 1921, prohibit any further dedication of the funds derived from the tax levies authorized in Acts No: 110 of 1890 and No. 6 of the Extra Session of 1899 (and referred to in the constitutional provision) after 1950, is also without merit. The fallacy of this argument is clearly demonstrated in the following excerpt from the able opinion of the trial judge:
 

 “These bonds that were issued under Act No. 4 of 1916 are serial bonds, and the interest on said bonds and the principal of the bonds as they mature are payable out of one-half of the surplus of the 1% Debt Tax, which was originally levied by Act No. 110 of 1890, and kept in force by Act No. 6 of the Extra Session of 1899 and other constitutional provisions, up to and inclusive of the year 1950.
 

 “The full faith and credit of the City of New Orleans are pledged to the payment of the principal and interest of these bonds, and if the one-half of the surplus of the 1% Debt Tax should not be sufficient to pay the interest and principal of any of these bonds as they mature, then the City is required to levy additional taxes necessary to pay the principal and interest on said bonds.
 

 “After the year 1950, when the Public Improvement Bonds issued under Act No. 6 of 1899 shall have been all retired and paid, the City of New Orleans is required
 
 *526
 
 to levy a sufficient tax upon all the taxable property of the City of New Orleans necessary to pay the principal and interest of all bonds outstanding, including all bonds that have been or may be issued under Act No. 4 of 1916. If the City of New Orleans should fail to levy said tax, then it becomes the duty of the Board of Liquidation, City Debt, to levy said tax.
 

 “An examination of Section 14 of Act No. 4 of 1916 shows that the Board of Liquidation, City Debt, as now organized and created, with all the powers, duties and functions described by
 
 existing laws
 
 and by this amendment, shall be continued while bonds authorized by this amendment are outstanding and unpaid.
 

 “The Court will examine Section 7 of Act No. 110 of 1890, which is also a part of the Constitution and which was a constitutional provision that was in force when Act No. 4 of 1916 was adopted by the people, you will find that this section provides that in case the City should fail to levy a tax sufficient to pay the interest and principal of said bonds, then Board of Liquidation, City Debt, ‘shall itself, by proper resolution, have power to levy said tax, and to collect the same; and, in said levy and collection, to use any and all the machinery, rights, powers and authority established by the State for the levy and collection of the State taxes.’
 

 “In other words, Section 14 of Act No. 4 of 1916 vests in the Board of Liquidation, City Debt, all ‘the powers, duties and functions prescribed by existing laws,’ and as Act No. 110 of 1890 gave it the powers above enumerated, it has the same powers in relation to the levy and collection of taxes to pay the interest and principal of bonds issued under Act No. 4 of 1916 that it had under the provisions of Act No. 110 of 1890 for the payment of bonds issued under said latter act.”
 

 Plaintiffs’ contention that the $12,000,000 proposed to be raised for the accomplishment of Purpose A of the ordinance is insufficient to pay the city’s share of the cost of constructing the under and overpasses necessary for the elimination of grade-crossings, and their further contention that the ordinance fails to insure the city’s control of the expenditure of the funds derived from the bonds, are both untenable.
 

 Any fear the plaintiffs may have that the identity of these funds will be lost by being commingled with other funds of the city, or that they will be handled by the Public Belt Railroad rather than by the Commission Council, and for purposes other than those intended, is groundless. These are all matters that are specifically regulated by statute. Act No. 4 of 1916. Under this law the issuance and sale of these bonds is placed under the jurisdiction of the Board of Liquidation, City Debt, and in this respect neither the Public Belt Railroad nor the Commission Council has any jurisdiction over the bonds. The taxes that are levied and collected for the re
 
 *527
 
 tirement of these bonds must be paid over to the Board of Liquidation, City Debt, day by day, as .they are collected and to this board is given the exclusive jurisdiction of applying these monies toward the retirement of the bonds. Sections 10, 11, and 14,
 

 The funds derived from the sale of these bonds can never be used for purposes other than “that stated in the submission of the proposition to said taxpayers,” (Section 4) and the ordinance specifically provides that “the proceeds of this bond issue shall be deposited in special trust fund accounts in the depository banks of the City of New Orleans, and shall be secured by the banks receiving said deposits and shall only be expended or withdrawn therefrom as herein provided. The expenditure of the proceeds of this bond issue shall be under the supervision of the Commission Council of the City of New Orleans, and said proceeds of said bond issue so deposited as aforesaid shall be expended only upon vouchers or checks drawn against said funds by the Commissioner of Public Finances, upon the approval of the Commission Council of the City of New Orleans.” Section 5 of Ordinance No. 17549. If and when an attempt is made to use these funds' for a purpose other than the elimination of grade-crossings by the construction of under and overpasses, and if and when the Public Belt Railroad and not the Commission Council of the City of New Orleans attempts to disburse these funds, it will be time enough for interested taxpayers to seek the appropriate relief to prevent the misapplication of such funds and their mishandling.
 

 We now pass to the attack that is being made on the legality of the election itself.
 

 It is the argument of the plaintiffs that the election was rendered null and void when, instead of the vote being cast legally and regularly, in accordance with law, this was done through the use of voting machines, since these machines, under the Voting Machine Law, are confined to primary and general elections and not to special taxpayer elections; in the alternative they contend that if the use of these machines is authorized in such elections by the act, that the same is unconstitutional in that the body of the act is broader than its title.
 

 While it is true that the object of the act is to make it mandatory that voting machines be used in all primary and general elections, the fact that in the body of the act the use of the machines is also authorized for the determination of amendments, propositions, or other questions that may be submitted to the vote of the people does not necessarily render the act unconstitutional. Peck v. City of New Orleans, 199 La. 76, 5 So.2d 508. Nor does the use of these machines in the special election strike the same with nullity for under the express provisions of Act No. 4 of 1916, authorizing the issuance of the bonds, it is declared that “The provisions hereof are
 
 *528
 
 self-operative, and the City of New Orleans and the several boards and bodies herein referred to shall carry the same into effect.” Section 21. No restriction is placed upon the city’s right to choose whatever medium it feels is best for recording the vote cast in such an election and it makes no difference, therefore, whether the city chooses to have the voter’s choice marked on a ballot and dropped into a box or to have such choice registered and marked on the ballot as fixed in the voting machine. The city has the unqualified right to set up whatever machinery it deems most expedient for registering the votes in such an election and it was well within its rights when it made provision in the ordinance that the official ballot to be used in the election was to be printed and set up in the voting machines so that every voter, in registering his vote, could make his mark on the ballot as so fixed in the machine to show that he was either for or against the stated proposition.
 

 It is our opinion, therefore, that the Commission Council was not only authorized to use these machines in the election but that, in choosing this medium for recording the votes, it followed the public policy established in this state to insure honest elections when the legislature adopted the Voting Machine Law (Act No. 84 of 1940, as amended and re-enacted by Act No. 138 of 1942). The fact that these machines were not so constructed as to tabulate the results is immaterial, for this function was delegated to the election commissioners by the ordinance and it has not been suggested or shown that the returns made by these officials were not honest and fair.
 

 The many irregularities alleged to have occurred during the course of the election (and above set out in detail) merit no further consideration than the statement that they are not supported by the evidence. We may add, also, that even if they had been established by the evidence, there is no allegation in the petition that the results of the election were in any way altered by their occurrence and no efforts were made to show that such was the case when the trial took place. See East Jefferson Water Works District v. Caldwell & Company, 170 La. 326, 127 So. 739; McCann v. Mayor and Councilmen of Morgan City, 173 La. 1063, 139 So. 481; 5 McQuillen on Municipal Corporations, 2d Ed., 1431 and 1437, Sections 2361 and 2361.2; 44 C.J. 1206, Section 4180.
 

 The allegations that are intended to establish a .scheme on the part of the proponents of the bond issue to confuse and mislead the voters so that a favorable vote might be secured, like so many of the other allegations contained in the petition, are not supported by the record.
 

 There is not a scintilla of evidence to show that the voters, or any one of them, were deprived of their right to vote by the withholding of their assessment certificates, or that any fraud resulted from
 
 *529
 
 the conduct of the election in conjunction with the general election at which a member of this court was selected, and we cannot assume that any did. On the contrary, the presumption is that those officiating at the election will follow and perform their duties as the law directs.
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 O’NIELL, C. J., absent.